1

2

3

4

5

6

7

8

9               IN THE UNITED STATES DISTRICT COURT

10                  FOR THE DISTRICT OF OREGON

11  ERVAN JOHNSON,                 )
                                   )
12          Plaintiff,             )    Civil No. 03-220-HU
                                   )
13      vs.                        )
                                   )
14  JO ANNE BARNHART,              )    FINDINGS AND RECOMMENDATION
    Commissioner of Social Security,)
15                                 )
            Defendant.             )
16  _____)

17  Alan Stuart Graf
    Amy Van Horn
18  1020 S.W. Taylor Street, Suite 370
    Portland, Oregon 97205
19
20          Attorneys for plaintiff

    Karin Immergut
21  United States Attorney
    District of Oregon
22  Craig J. Casey
    Assistant United States Attorney
23  888 S.W. Fifth Avenue, Suite 1000
    Portland, Oregon 97204-2024
24
    David M. Blume
25  Special Assistant United States Attorney
    701 Fifth Avenue, Suite 2900 MS/901
26  Seattle, Washington 98104

27          Attorneys for defendant

28  / / /

    1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Ervan Johnson brought this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance benefits and Supplemental Security Income (SSI) disability benefits.

**Procedural Background**

Mr. Johnson filed concurrent applications for disability insurance benefits and SSI disability benefits in March 1994. On September 8, 1995, an Administrative Law Judge (ALJ) found him disabled since 1985 as a result of lumbar and cervical spine impairments and drug and alcohol abuse. The Commissioner subsequently terminated Mr. Johnson's benefits as of January 1, 1997, pursuant to Public Law 104-121, because drug and alcohol abuse were material to his disability.

Mr. Johnson did not appeal the termination, but filed new applications for disability insurance and SSI disability benefits in February 1997, alleging disability since January 1, 1997 from back pain, pain and numbness in the right arm and leg, seizures, and the residual effects of a stroke. His applications were denied initially and on reconsideration.

A hearing was held on October 19, 1998. On October 26, 1998, ALJ Dan R. Hyatt issued a decision finding Mr. Johnson not disabled. Over two years later, on November 30, 2000, the Appeals Council vacated the ALJ's October 1998 decision and remanded the case for further proceedings, instructing the ALJ to 1) obtain Mr. Johnson's updated medical records from the Kaiser Permanente Neck

2 - FINDINGS & RECOMMENDATION

and Back clinic; 2) obtain evidence from a medical expert about the nature and severity of Mr. Johnson's musculoskeletal impairments; 3) reconsider Mr. Johnson's residual functional capacity (RFC); and 4) obtain supplemental vocational expert evidence.

On September 6, 2001, ALJ Hyatt held another hearing and heard testimony from Mr. Johnson and from Scott Stipe, a vocational expert. On January 25, 2002, the ALJ issued another decision finding Mr. Johnson not disabled. On December 16, 2002, the Appeals Council denied Mr. Johnson's request for review, making the ALJ's decision the Commissioner's final decision.

## Factual Background

Born December 30, 1946, Mr. Johnson was 50 years old at the time of his application, and 55 years old at the time of the ALJ's second decision. He completed the 10th grade. He last worked as a laborer in 1985, and consequently has no past relevant work experience.

## Medical Evidence

On May 3, 1995, Mr. Johnson was seen in the emergency room at Emanuel Hospital after a car accident on May 2, 1995. Tr. 311. The attending physician's notes indicate that Mr. Johnson had a history of sciatica related to a work injury suffered approximately five years earlier.

Mr. Johnson's complaints were pain in the lower back, radiating into the left leg and slight numbness and tingling in the left leg. Id. He stated that he had had similar pain many times in the past related to the previous work injury. Id. Physical examination was unremarkable except for some paraspinal tenderness in the area of his lumbar spine and positive straight leg test,

3 - FINDINGS & RECOMMENDATION

with pain radiating to the left ankle when his leg was brought to 90 degrees in a seated position. Id. He was neurologically intact and ambulating without significant difficulty, with no significant direct spine tenderness. Tr. 312. No x-rays were taken. Id. Diagnosis was lumbar strain and sciatic exacerbation.

On August 29, 1996, Mr. Johnson lacerated the palm of his right hand after falling while intoxicated. Tr. 309. He was able to move all fingers, had good flexion, extension, and strength of the fingers, and was able to make a fist, although grip strength was slightly decreased on the right. Id. X-rays ruled out fracture and foreign body. Id. He returned for suture removal on September 25, 1996. Tr. 307. The wound was clean, without redness, swelling or damage. Id. He had full range of motion of the fingers and hand. Id.

On April 3, 1997, Keith Cunningham, M.D., performed a physical examination for Disability Determination Services. Tr. 295. Dr. Cunningham recorded that Mr. Johnson stated that his problems began in 1995, when he began experiencing lower back pain, but that he had not seen a health care provider or had a physical examination in more than 10 years. Id. His current symptoms were lower back pain, sometimes sharp and sometimes dull, which was worsened by what he described as "any movement." Id. He denied any recurrent trauma, radicular symptoms, weakness or bowel or bladder incontinence. Id.

Mr. Johnson described intermittent cramping in the right calf over the last three to four years. Id. He denied any known injury or trauma to the right leg and was uncertain as to what might be precipitating it. Id. According to Dr. Cunningham, Mr. Johnson's

4 - FINDINGS & RECOMMENDATION

description of the symptoms were "rather variable;" sometimes Mr. Johnson said the cramping involved his entire leg, then that it only involved his calf. Id. He was unable to identify any precipitating or alleviating factors. Id. He denied any swelling or coolness of the right lower extremity, or history of deep vein thrombosis. Id. Mr. Johnson said he had been able to walk and carry on daily activities despite this problem. Tr. 296.

Regarding his right arm, Mr. Johnson was "again rather vague despite prompting." Id. He described his symptoms as "poor strength." Id. He was unable to identify a specific injury to his right arm, and explained its onset as the sudden sensation of weakness upon waking, three to four years previously. Id. He denied any parasthesias or loss of strength, but then said he felt his right biceps was "collapsing." Id. However, he was unable to describe any hindrances to daily activities caused by these symptoms. Id. He denied similar symptomatology in his left arm, and denied any neck trauma or trauma to the upper arm region. Id.

Mr. Johnson told Dr. Cunningham that he maintained his own home, cleaning and doing dishes, laundry and cooking, and driving himself on errands. Dr. Cunningham observed that Mr. Johnson was able to walk easily to and from the examination room, sit comfortably during the exam, undress and undress, and to mount and dismount the examination table without difficulty. Id. However, he reeked of alcohol. Id.

Physical examination revealed normal range of motion, fair coordination, and normal gait. Tr. 297. Mr. Johnson was able to oppose the thumb to all fingers and operate buttons, zippers and strings without difficulty. Tr. 298. Examination of his back

revealed increased lordosis with no evidence of scoliosis. Tr. 298. There was no evidence of paravertebral muscle spasm or point tenderness. <u>Id.</u> Strength was equal and normal in both upper and lower extremities. <u>Id.</u> There was no evidence of atrophy. <u>Id.</u> The biceps were equal, as were the forearms and calves. <u>Id.</u> There was no evidence of contractures or fasciculations. <u>Id.</u> Sensory examination was intact. <u>Id.</u> Pulses were 2+ and equal. <u>Id.</u>

Dr. Cunningham found no evidence of neuromuscular deficits of the back, right hand or right leg, nor did he find any evidence of weakness in hand grip or deficits of hand dexterity, or of vascular insufficiency of the right leg. <u>Id.</u> He diagnosed chronic alcohol abuse. <u>Id.</u> Dr. Cunningham concluded, "Overall subjective complaints far outweigh objective findings." <u>Id.</u>

On April 26, 1997, Mr. Johnson presented at the emergency room at Emanuel Hospital. Tr. 299. Mr. Johnson related that he drank approximately one pint of whisky a day and had done so for many years. <u>Id.</u> He had not had a drink for 24 hours when he presented with a seizure to the emergency room. <u>Id.</u> Mr. Johnson related that he was seated on the sofa talking to his mother when he had the sudden onset of a staring spell, frothing at the mouth. Tr. 301. His mother put him on the floor. He had stiffening and shaking of the extremities. <u>Id.</u>

Physical and neurological examination were unremarkable. <u>Id.</u> When a CT scan of the head showed questionable abnormality in the right parietal area, he was admitted for detoxification. Tr. 299. He had no further seizures. <u>Id.</u> Mr. Johnson was discharged with a prescription for Dilantin and instructions to stop drinking. Tr. 303.

The medical record resumes on December 27, 2000, when Mr. Johnson presented to the emergency room after a car accident, reporting back pain. Tr. 332. He was found to have minor muscle spasms. Id.

On January 9, 2001, Mr. Johnson reported to Kaiser Primary Care for back pain radiating down to his right lower extremity, with numbness and tingling. Tr. 322. He reported that the pain had been present for about five years, but was "quite vague on the extent of the symptoms and duration of the symptoms since then." Id. Mr. Johnson said the symptoms were somewhat worse since the December 2000 car accident. Tr. 323. He noted no weakness, but said he had pain, numbness and tingling that worsened with walking. Id. After three to four blocks, he said, he had pain in the calf and radiating from his back going down to his foot with numbness and tingling. Id.

Upon examination, Mr. Johnson appeared fatigued. He had a mild tremor. Gait was normal, though mildly antalgic to the right. He was able to lift his feet when asked to heel walk, and was able to toe walk. He had tenderness to palpation of the right lower back. Strength in the hamstrings and quadriceps was normal bilaterally. Id.

On February 1, 2001, Mr. Johnson was seen at Kaiser by Peter Rega, M.D. for evaluation of chronic low back pain. Tr. 318. Mr. Johnson reported that he had had low back and leg pain for many years, possibly since an injury 15 years earlier. Id. He described lower back pain radiating down his right leg as far as the foot, with numbness in the foot. Tr. 319. He said his walking was limited to about 1.5 blocks because of crampy pains in both calves, worse

7 - FINDINGS & RECOMMENDATION

when walking uphill. Mr. Johnson also complained of long-standing numbness in the right hand with weakness in the right arm. Id.

Standing examination of the spine revealed no pelvic tilt or spine asymmetry. Tr. 319. There was tenderness across the lower back and mild low lumbar paraspinous tenderness. Id. Forward flexion was fairly well performed, with some pain radiating down the right leg. Id. Extension caused low back pain without radiation. Id. Muscle strength testing revealed that he could walk briefly on heels and toes. There was some possible weakness of right great toe dorsiflexion compared to the left. He had poorly-defined sensory loss in the right foot compared to the left, but not a definite proximal sensory change. Straight leg raising was well done on the left, but caused pain in the back of the leg at greater than 60 degrees on the right as well as low back pain. Hip abduction and rotation were good. Id.

Dr. Rega's diagnosis was chronic low back and right leg pain associated with degenerative disease of the spine. Tr. 320. The pain down the leg that was worse with standing was suggestive of lumbar radiculopathy. Id. However, Dr. Rega also considered the possibility of vascular insufficiency as a result of tobacco use. Dr. Rega also noted that Mr. Johnson had extensive calcification of the aorta, and thought the difficulty walking more than 1.5 blocks might be claudication associated with tobacco abuse. Id.

Dr. Rega thought the right hand numbness might be carpal tunnel, although examination revealed no obvious Tinel's sign. Id. He recommended the use of a splint for the right wrist and referred Mr. Johnson for a nerve test to see if surgery would be helpful. Tr. 338. He also recommended the following: attention to posture

8 - FINDINGS & RECOMMENDATION

while sitting and working; the use of a foam pad at the base of the back while driving or sitting; taking rest periods several times during the day in a comfortable position with spine flat and knees bent; sleeping on the back or side with a pillow under the knees; local application of cold to the painful area 5-10 minutes several times a day; wearing good supportive shoes; walking as much as he was able; and exercise in a swimming pool if possible. Tr. 338. Dr. Rega suggested that he return if he did not improve over the next six weeks. Tr. 339.

Nearly seven months later, on August 27, 2001, Mr. Johnson was seen by Miguel Ramirez-Williams, a nurse practitioner. Tr. 344. Mr. Ramirez-Williams noted that Mr. Johnson was able to ambulate without assistance, although his gait was somewhat ataxic (uncoordinated) and wide based. Tr. 345. Ataxia can be due to many things. No cause is identified by the nurse practitioner. He observed that Mr. Johnson had mild difficulty getting on and off the examining table, and that his posture was bent over. Id. Forward flexion was slightly limited, but otherwise spinal range of motion was normal. Id. There was no tenderness or spasm of the lumbar paraspinous muscles and no sacroiliac tenderness. Id. Lumbar root testing was normal. Straight leg raising was normal on the left and on the right. Tr. 346.

Mr. Johnson described the severity of his pain as a "2," explained as continuous, but not severe pain. Tr. 345. Mr. Ramirez-Williams's conclusion was low back pain without radicular findings. Tr. 346. An x-ray of the lumbosacral spine taken August 27, 2001 revealed age-related changes in comparison with an x-ray dated September 17, 1998, but other than age-related changes, the two

9 - FINDINGS & RECOMMENDATION

studies were grossly similar. There was evidence of degenerative disc disease, osteoarthritis in the facet joints, and mild osteophyte formation. However, there was no evidence of fracture or spondylolysis, vertebral bodies appeared intact, and bony alignment was within normal range. <u>Id.</u>

## Hearing Testimony

Mr. Johnson testified at the hearing that he had pain in his back and "no feeling" in his right arm. Tr. 38. He said he is unable to lift anything with his right hand. Tr. 41. With respect to his left hand, Mr. Johnson was asked if there was anything wrong with his left hand, and he answered, "Well, not all the way. But you know, it's I can't lift that much with this." <u>Id.</u> When asked why, Mr. Johnson responded, "I guess, this whole things running, you know. I really don't know." Tr. 42. Mr. Johnson estimated that he could lift between 10-20 pounds with his left arm, but that it would hurt his back to lift 10 or 15 pounds. Tr. 42, 44.

Mr. Johnson said it was hard for him to walk two or three blocks without stopping and resting because if he walks too far his leg and foot get numb and he "can't feel my feet hitting the pavement." <u>Id.</u> Mr. Johnson said later that after walking he gets "big old charlie horses in my legs down there," referring to both thighs. Tr. 45. He also said that when he walks he has a hard time breathing. Tr. 47.

Mr. Johnson said he cannot sit down for long because if he sits still, the back of his leg starts cramping, and "when my legs start cramping, my back starts hurting." Tr. 44. He estimated that he could stand for about 10 minutes before his legs started hurting. Tr. 45.

10 - FINDINGS & RECOMMENDATION

The ALJ called a vocational expert (VE), Scott Stipe. Tr. 47.
He asked Mr. Stipe to consider an individual between the ages of 50
and 53, with Mr. Johnson's educational level and work history,
capable of lifting 20 pounds occasionally and 10 pounds frequently,
with the dominant right arm being used only for assisting, who
would need to sit or stand at will. Tr. 48. The VE opined that
there were no jobs in the national economy that such a person could
perform. Id. The ALJ then asked about a person who could use the
right arm for lifting up to 10 pounds and the left for lifting 20
pounds. Again, the VE could think of no jobs in the economy that
such an individual could perform without additional training or
accommodations. Id. The ALJ then clarified his hypothetical to mean
that the limitation on the right arm was limited to lifting, but
not to dexterity. Tr. 50. The VE opined that such a person could
work as a cashier, an electronics worker, in a variety of packaging
and sealing types of occupations, and as a ticket taker. Tr. 50-51.
The VE did not think that an inability to walk more than three
blocks would affect those jobs. Tr. 51. The VE also noted that the
jobs would not require lifting at the level posited by the ALJ,
explaining that the jobs are defined as light because they entail
operating a cash register. Tr. 52.

### ALJ's Decision

The ALJ found no objective evidence of a medically
determinable impairment that could reasonably be expected to
produce the right hand and arm weakness and numbness that Mr.
Johnson described. The ALJ noted that Mr. Johnson had not claimed
neck and arm pain at the hearing and had not reported them to his
health care practitioners during the relevant period. Further,

11 - FINDINGS & RECOMMENDATION

clinical findings during that period had shown essentially normal range of motion of the neck and upper extremities, with normal strength and no evidence of muscle atrophy or diminished upper extremity sensation. Although the ALJ noted that in February 2001, Dr. Rega thought Mr. Johnson's reported right hand numbness and weakness suggested carpal tunnel syndrome, Tinel's sign was not apparent on examination and no objective evidence was offered to support such a diagnosis. The ALJ noted further that there was no definitive evidence of a stroke in the record.

The ALJ found that there was medical evidence of an impairment that could reasonably be expected to produce symptoms related to Mr. Johnson's back and lower extremities, but found his testimony about his symptoms not fully credible. The ALJ's reasons were: 1) Mr. Johnson's testimony that he had to move around and could not sit more than ten minutes was contradicted by his testimony that he had recently traveled by bus to Oklahoma, a 2 1/2 day trip, and that in Oklahoma he had been able to help his daughter and her three children while she was ill; 2) in April 1997, Mr. Johnson reported that he was able to maintain his own home, do dishes, cook, play dominoes with friends, drive to and from errands, and do laundry; 3) there were no treatment or medical records from September 1998 to December 2000, and when Mr. Johnson had sought treatment, only conservative care had been recommended; 4) in August 2001, Mr. Johnson's pain was assessed as "mild" persistent pain or "occasional moderate" pain; and 5) there was no evidence that Mr. Johnson ever participated in recommended physical therapy.

The ALJ rejected Mr. Johnson's testimony about weakness and numbness in his right arm and hand, noting that Mr. Johnson had

12 - FINDINGS & RECOMMENDATION

testified that he was able to play cards and dominoes; that Dr. Cunningham found no deficits with hand dexterity, observing that Mr. Johnson was able to operate buttons, zippers and string without difficulty; and that Mr. Johnson had not complained of significant neck or arm pain to health care providers, and there was no evidence that he had ever been treated for it.

The ALJ found no objective medical evidence of disability based on seizures, because the record included evidence of only one seizure in 1997, and indicated that the seizure was related to a single alcohol-related event.

The ALJ concluded that Mr. Johnson retained the residual physical capacity to perform the range of light work activities identified by the VE, including electronics packager, hand packager, and ticket seller.

## Standard of Review

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is

13 - FINDINGS & RECOMMENDATION

susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, the claimant is conclusively presumed disabled. <u>Yuckert</u>, 482 U.S. at 141. If not, the Commissioner goes to step three.

In step three, the Commissioner determines whether the

14 - FINDINGS & RECOMMENDATION

impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

### Discussion

Mr. Johnson asserts that the ALJ erred in rejecting his symptom testimony.

A claimant's symptom testimony may be disregarded if it is unsupported by medical evidence which supports the *existence* of that symptom, even though the claimant need not submit medical evidence which supports the *degree* of symptom. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 347 (9th Cir. 1991)(en banc). The ALJ found no evidence of the existence of an impairment which could reasonably be expected to produce numbness and weakness in Mr. Johnson's right

arm and hand. Mr. Johnson argues that objective evidence exists in the form of Dr. Rega's finding on February 1, 2001 of numbness suggestive of carpal tunnel-like sensory changes.

However, Dr. Rega recorded only that Mr. Johnson *complained of* numbness suggestive of carpal tunnel. There was no indication that examination revealed an actual sensory deficit. A clinical sign of carpal tunnel syndrome (Tinel's) was absent. There was no indication that nerve conduction studies confirmed a diagnosis of carpal tunnel syndrome. And finally, there was no other condition proposed by any practitioner who saw Mr. Johnson which would account for numbness and loss of strength in the right hand and arm. In fact, physical examinations consistently revealed that there was no atrophy of the right arm and no diminution of grip strength or dexterity in the right hand. See Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001)(proper for the ALJ to reject claimant's testimony in the absence of neurological or orthopedic evaluations showing disabling abnormality of claimant's upper or lower extremities or evidence of disuse muscle atrophy). I find no error in the ALJ's rejection of Mr. Johnson's testimony that he suffered from weakness and numbness of the right arm and hand.

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

The ALJ found that Mr. Johnson had a medical impairment which could reasonably be expected to produce the back pain and the numbness and tingling into the right leg and foot of which he

16 - FINDINGS & RECOMMENDATION

complained. Although there was some evidence of malingering in Dr. Cunningham's comment that Mr. Johnson's complaints far outweighed his objective symptoms, the ALJ did not find that Mr. Johnson was a malingerer. The "clear and convincing" standard therefore applies to the ALJ's assessment of Mr. Johnson's credibility with respect to his back and leg symptoms.

In evaluating Mr. Johnson's symptom testimony, the ALJ was required to consider factors set out in SSR 88-13, which include the observations of treating and examining physicians and other third parties regarding the nature, onset, duration and frequency of the claimant's symptom; precipitating and aggravating factors; functional restrictions caused by symptoms; and the claimant's daily activities. <u>Smolen v. Chater</u>, 80 F.3d 1273 (9th Cir. 1996). The ALJ may also consider inconsistencies in testimony and the unexplained absence of treatment for excessive pain. <u>Orteza v. Shalala</u>, 50 F.3d 748 (9th Cir. 1995).

These factors were applied by the ALJ in evaluating Mr. Johnson's testimony. The ability to travel for 2 1/2 days on the bus to Oklahoma is inconsistent with Mr. Johnson's testimony that he was unable to sit for more than 10 minutes at a time, and with his testimony at the earlier hearing that he is required to lie down and rest several times a day. Mr. Johnson's testimony that he plays cards and dominoes is inconsistent with his testimony of numbness in his hands. Mr. Johnson's testimony of incapacitating pain is inconsistent with his description of the pain to Mr. Ramirez-Williams as a "2," and as not severe.

Moreover, Mr. Johnson's description of his symptoms to health practitioners has been inconsistent: in 1995, Mr. Johnson

17 - FINDINGS & RECOMMENDATION

complained of lower back pain radiating into the *left* leg, with slight numbness and tingling in the *left* leg. Straight leg test at that time caused pain radiating into the left ankle. In 1997, Mr. Johnson described intermittent cramping in the *right* calf over the last three to four years. Dr. Cunningham recorded that Mr. Johnson's reports of symptoms were variable; sometimes he said the cramping involved the entire leg, and sometimes he said it involved only his calf. Mr. Johnson told Dr. Rega in 2001 that he had crampy pains in *both* calves. Straight leg testing elicited pain on the right. Mr. Johnson testified at the hearing that walking for any distance caused his feet to become numb, such that he could not feel the pavement when he walked; later he testified that walking caused him to get "charlie horses" in both thighs.

Mr. Johnson's description of his incapacitating pain and extreme functional limitations is also inconsistent with the observations of the health practitioners who examined him. Dr. Cunningham noted that Mr. Johnson was able to walk easily to and from the examination room, sit comfortably during the exam, undress and undress, and mount and dismount the examination table without difficulty. Dr. Cunningham's examination revealed normal range of motion, fair coordination, and normal gait. Mr. Ramirez-Williams observed that Mr. Johnson was able to ambulate without assistance, although his gait was somewhat ataxic and wide based, that he had only mild difficulty getting on and off the examining table, that spinal range of motion was normal except for slightly limited forward flexion, that there was no tenderness or spasm of the paraspinous muscles and no sacroiliac tenderness.

There is no objective medical evidence of radiculopathy or

18 - FINDINGS & RECOMMENDATION

neuromuscular deficits which would account for the claimed severity of the cramping in the right leg or the numbness in the right foot. X-rays revealed joint changes consistent with aging, but vertebral bodies were observed to be normal and the spine was normally aligned. According to Mr. Ramirez-Williams, lumbar root testing was normal. Although Dr. Rega found some pain with straight leg raising, Doctor Cunningham and Mr. Ramirez-Williams did not.

It is proper for the ALJ to reject testimony of excessive pain due to back injury when the claimant does not receive medical treatment, or the physician prescribes only conservative treatment during that period. See <u>Johnson v. Shalala</u>, 60 F.3d 1428 (9th Cir. 1995). Substantial evidence supports the ALJ's finding that during the period at issue, Mr. Johnson consulted medical practitioners infrequently and, when he did, received only conservative treatment such as suggestions that he take ibuprofen and Motrin, attend physical therapy, and apply cold or heat. The absence of any evidence that Mr. Johnson was ever prescribed any of the analgesics commonly prescribed for pain, and his lack of participation in the recommended physical therapy were also permissible bases for the ALJ's finding Mr. Johnson not fully credible. <u>Osenbrock</u>, 240 F.3d at 1166. See also <u>Meanel</u>, 172 F.3d at 1114(ALJ may properly consider doctor's failure to prescribe, and claimant's failure to request, any serious medical treatment for allegedly severe pain); <u>Bunnell</u>, 947 F.2d at 346 ("unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is a relevant factor in assessing credibility of pain testimony). Mr. Johnson's only explanation for his failure to seek treatment for long periods of time or to follow through with their

19 - FINDINGS & RECOMMENDATION

recommendations was that he did not think the doctors did him any good.

The parties dispute the significance of Dr. Rega's recommendation to Mr. Johnson that he rest several times a day by lying down with his spine flat and his knees bent. Mr. Johnson argues that this advice constitutes evidence that he is unable to work because his doctor has ordered him to lie flat several times a day. However, I disagree. There is no indication that Dr. Rega intended Mr. Johnson to follow these instructions for the indefinite future. They were included with several other recommendations, including "attention to posture while sitting *and working*" (emphasis added), walking, and exercising. Mr. Johnson was instructed to return if he did not improve over the next six weeks, indicating that Dr. Rega expected this regimen to effect an improvement in Mr. Johnson's symptoms. The record indicates that he did not seek treatment again until nearly seven months later.

The ALJ's credibility findings are clear, convincing, and based upon substantial evidence in the record. I find no error.

Mr. Johnson asserts that the ALJ erred by disregarding the testimony of lay witness Marcia Lee. In a third-party questionnaire submitted March 28, 1997, Ms. Lee stated that Mr. Johnson needed help taking out the trash if it was heavy and that he was "always rubbing his arm & leg complains of hurting arm and body all of the time." Tr. 254. I find no error in the ALJ's failure to consider this evidence because it is not probative. In his questions to the VE, the ALJ limited Mr. Johnson to lifting no more than 20 pounds with the left arm and 10 pounds with the right. An inability to lift "heavy" trash bags is not inconsistent with this finding. The

20 - FINDINGS & RECOMMENDATION

ALJ's failure to take note of Ms. Lee's testimony that Mr. Johnson complained of pain is not error, because the ALJ did not entirely disregard Mr. Johnson's complaints of pain. The ALJ merely found that Mr. Johnson's complaints of constant and incapacitating pain were not credible.

Mr. Johnson contends that the ALJ erred in failing to comply with the order of the Appeals Council to "obtain evidence from a medical expert to clarify the nature and severity or the claimant's musculoskeletal complaints." The ALJ did not consult a medical expert upon remand and did not mention this aspect of the Appeals Council's order on remand. Mr. Johnson argues that this error was prejudicial because the ALJ rejected several of his complaints for lack of medical evidence, "and did not determine the effects of the calcification of Plaintiff's aorta shown on exam in 2001, showing possible vascular insufficiency." Plaintiff's Opening Brief, p. 15.

I disagree. The order from the Appeals Council to obtain evidence about the nature of Mr. Johnson's musculoskeletal complaints does not require the ALJ to consult a medical expert about the effects of possible vascular insufficiency. The medical record contains evidence which reflects Mr. Johnson's musculoskeletal complaints after November 30, 2000, the date on which the Appeals Council issued its decision. Those records are summarized at pages 7-10 above. Moreover, if the ALJ elicited testimony from a medical consultant, it would not change the absence of objective clinical evidence supporting Mr. Johnson's claimed loss of use on his right arm and hand, or the claimed degree of pain and incapacity related to the lower back pain.

I recommend that the Commissioner's decision be affirmed and

21 - FINDINGS & RECOMMENDATION

that this case be dismissed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due February 18, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due March 4, 2005, and the review of the Findings and Recommendation will go under advisement on that date.


Dated this 3rd day of February, 2005.


/s/            Dennis James Hubel
                Dennis J. Hubel
        United States Magistrate Judge

22 - FINDINGS & RECOMMENDATION